## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **LUKE BOWMAN, ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **NO. 21-1071** |
| **R.L. YOUNG, INC., ET AL.** | **SECTION: D (5)** |

## <u>ORDER & REASONS</u>

Before the Court is a Motion for Partial Summary Judgment filed by Defendant R.L. Young, LLC ("YA" or "Defendant").[1] Plaintiffs Luke Bowman ("Bowman") and A&H Solutions, Inc. (collectively "Plaintiffs") oppose,[2] and Defendant filed a reply brief in support of its Motion.[3]  For the reasons that follow, the Motion is **GRANTED IN PART AND DENIED IN PART**.

### I.    Factual and Procedural Background

This action was initiated by Luke Bowman and A & H Solutions, Inc. in the Civil District Court for Orleans Parish.[4]  Bowman brought this action "to seek payment of unpaid wages, penalty wages, and attorneys' fees," among other damages, claiming that the Defendant, R. L. Young, LLC (d/b/a Young & Associates, or "YA"), had failed to pay him his due wages while he worked with them as an independent contractor in various roles in the operation of their business in the Southeast United States.[5]  Defendant engaged Bowman to provide repair estimating services for

---

[1] R. Doc. 122.
[2] R. Doc. 129.
[3] R. Doc. 143.
[4] R. Doc. 1-2.
[5] *Id.*

Defendant, and entered into an independent consulting agreement (the "ICA") as to certain terms.[6]  At Defendant's request, Bowman moved to New Orleans to establish an office in the city for  Defendant and to expand the company's operations throughout the southeast United States.[7]   As a result of this additional work, Plaintiffs claim that Defendant and Bowman entered into three agreements (one in writing and two orally) that entitled Bowman to be distributed certain override profit payments from Defendant's profits and that Defendant failed to distribute such payments.[8]  After removing to this Court on the grounds of diversity jurisdiction,[9] Defendant filed a counter-claim, asserting that Bowman had breached his agreement with Defendant in numerous ways and was therefore responsible to Defendant for damages.[10]   In response to a motion to dismiss[11] and a motion for summary judgment[12] filed by Bowman, the Court dismissed all counts of the counterclaim.[13]

There is a great deal of disagreement as to what was and what was not said in communications which are alleged to form the basis for the oral agreements. Generally, Defendant asserts that it either made no concrete promises to Bowman orally or that there was no agreement as to terms.[14]  What is agreed is that the parties entered into an agreement as to a Profit Share Override Policy ("PSOR") in late

---

[6] *See* R. Doc. 1-2 at pp. 4, 5.
[7] *Id*. at p. 4.
[8] *Id*. at pp. 7, 8-9.
[9] R. Doc. 1.
[10] R. Doc. 29.
[11] R. Doc. 49.
[12] R. Doc. 110.
[13] R. Docs. 163 and 164.
[14] R. Doc. 122-2 at p. 2.

2015.[15]  Pursuant to that policy, Bowman was entitled to $10 per hour billed on "any consultant hours that you supervise (not including your own)," subject to certain requirements.[16]  He was given a unique code that "must be embedded into the Project Notes section of any job that [he was] expecting to receive [credit] for."[17]  On properly-coded projects, Bowman would then receive the $10-an-hour once "the invoice becomes 5 months old AND it's paid in full."[18]  Even on this agreement, however, there is some dispute as to its meaning.  Bowman contends that he was told by Wade Bushman, then the partner in charge of the Southeast region, that Bowman "would receive the $10 an hour regardless of any hold back or allocation regarding expenses and regardless of whether or not the client paid the invoice in full."[19]  Defendant disputes this, claiming that there could be several reasons that the $10-an-hour may be modified, including due to "swing consultants," which were consultants from one region temporarily assigned to another region.[20]

The second alleged agreement came about as a result of the success Defendant and Bowman were enjoying in the southeast region.  Per Defendant, "Bowman's override compensation changed from the PSOR Program to an override system in which Bowman received a discretionary share of Bushman's revenue from the Southeast Region."[21]  Defendant insists that "[t]he amount Bowman received was

---

[15] R. Doc. 129-4 at p. 11.
[16] R. Doc. 129-4 at p. 12.
[17] *Id.* (emphasis removed).
[18] *Id.* (emphasis removed).  Wade Bushman also states that partner approval was required to put a PSOR code on a job, but the document itself contains no such requirement.  R. Doc. 122-6 at p. 8.
[19] R. Doc. 122-7 at p. 7.
[20] R. Doc. 143-1 at p. 1.
[21] R. Doc. 122-2 at p. 8.

discretionary and . . . was never a set determined dollar amount or percentage of the regional profits."[22] Indeed, Bowman himself testified that "it was never disclosed" what percentage he would receive[23] (although he indicated that he believed there was a determinable percentage that he was owed).[24] Instead, he suggested that he was told that he "would make a percentage equivalent to the $10-an-hour deal" he had been receiving under the terms of the PSOR.[25]   Bowman also contends that Ray Young, CEO and owner of YA, agreed to "match" Bushman's contribution.[26]  For his part, Bushman contends that while there was a "Luke Bowman specific" "phase where I gave him a percentage of my profits,"[27] there was never a full agreement but, instead, a "[g]enerous"[28] and "[d]iscretionary"[29] phase where, "to incentivize [Bowman],"[30] Bushman gave up some of his profit to Bowman out of the goodness of his heart.  Bushman did, however, identify a specific percentage that he was giving Bowman: seven percent.[31]

The third alleged agreement relates to what Defendant termed the "Leadership Pool." Under this system, which replaced the preceding "Bowman-specific phase," Bowman and three other YA contractors (Lyn Crabtree, Peter Padilla, and David Schifani) were placed in a "leadership pool" where Bushman and Young

---

[22] *Id.* (emphasis removed).
[23] R. Doc. 122-7 at p. 9.
[24] *Id.* at p. 8.
[25] *Id.* at p. 10.
[26] R. Doc. 129-13 at p. 46.
[27] R. Doc. 129-2 at p. 17.
[28] *Id.* at p. 27.
[29] *Id.* at p. 30.
[30] *Id.* at p. 33.
[31] *Id.* at p. 35.

would place some of their profits into a pool in which those four would share.[32]

Bushman intended to contribute five percent of his profits into the pool and Young

agreed to match it.[33] Bushman stated that he does not remember discussing with

Bowman how joining the leadership pool might or might not affect Bowman's take-

home pay,[34] and he likewise stated that it "doesn't surprise" him that there would be

no formal documentation of the profit-sharing agreement of the leadership pool.[35] He

described the profits that were shared with the leadership pool as "funds that

belonged to us [that is, Bushman and Young] that we were giving them [Bowman,

Crabtree, Padilla, and Schifani]," and referred to it as "[f]unds, gift, compensation,"

but denied that there was an agreement as to percentage or that he or Young had

ever clearly identified to the leadership pool what they could expect to receive from

their participation.[36] For his part, Bowman contends that he was told that, whatever

it was exactly that he would be receiving from the leadership pool, "it would be

equivalent to the individual override that [he] had already been receiving," that is,

equivalent to the percentage agreement he believed he had with Bushman that had

replaced the PSOR system.[37]

     In sum, Bowman believes that he had three successive agreements with

Defendant: first, the PSOR agreement; second, a "deal equivalent to the first deal

plus a match from Ray;" and third, "a percentage from the first deal matched by Wade

---

[32] R. Doc. 122-6 at p. 11.
[33] *Id.* at p. 12.
[34] *Id.*
[35] *Id.* at p. 13.
[36] *Id.*
[37] R. Doc. 129-13 at p. 41.

and Ray, but . . . the entire team was sharing in that."[38]  Defendant agrees only that the PSOR agreement was an enforceable contract and disputes even that Bowman is correct as to the terms of that agreement.

Now before the Court is a Motion for Partial Summary Judgment filed by Defendant in which Defendant claims that there is no genuine issue as to any material fact for any of Bowman's claims aside from his request for declaratory judgment.[39]  In particular, Defendant states that it ought to be granted summary judgment as to Bowman's claims for breach of contract, violation of the Louisiana Wage Payment Act (LWPA), violation of the Louisiana Unfair Trade Practices Act (LUTPA), fraud and fraudulent inducement, negligent misrepresentation, and detrimental reliance.

## II.   Legal Standard

Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate where the record reveals no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine dispute of fact exists where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.[40]  A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[41]

---

[38] *Id.* at p. 46.
[39] R. Doc. 122.
[40] *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).
[41] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Supreme Court has emphasized that the mere assertion of a factual dispute does not defeat an otherwise properly supported motion.[42] Therefore, where contradictory "evidence is merely colorable, or is not significantly probative," summary judgment remains appropriate.[43]  Likewise, summary judgment is appropriate where the party opposing the motion fails to establish an essential element of its case.[44]  In this regard, the nonmoving party must do more than simply deny the allegations raised by the moving party.[45]  Instead, it must come forward with competent evidence, such as affidavits or depositions, to buttress its competing claim.[46]  Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible at trial do not qualify as competent opposing evidence.[47]  Finally, in evaluating a summary judgment motion, the Court must read the facts in the light most favorable to the nonmoving party.[48]

### III.   Analysis

### A. Breach of Contract

"Under Louisiana law, '[t]he essential elements of a breach of contract claim are [that] (1) the obligor[] undert[ook] . . . an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted

---

[42] *See id.*
[43] *Id.* at 249–50 (citation omitted).
[44] *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).
[45] *See Donaghey v. Ocean Drilling & Expl. Co.*, 974 F.2d 646, 649 (5th Cir. 1992).
[46] *Id.*
[47] Fed. R. Civ. P. 56(c)(2); *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987) (per curiam).
[48] *Anderson*, 477 U.S. at 255.

in damages to the obligee.'"[49]  Where, as here, an oral contract is at issue, it "is widely held that only general corroboration must be shown; independent proof of every detail is not needed."[50]  However, La. C.C. Art. 1846 provides that, for "a contract not reduced to writing … [where] the value is in excess of five hundred dollars, the contract must be proved by at least one witness and other corroborating circumstances."[51]  While "a party may serve as his own witness and the 'other corroborating circumstances' may be general and need not prove every detail of the plaintiff's case . . . the corroborating circumstances that are required must come from a source other than the plaintiff."[52]  As each of the alleged contracts which Bowman claims were breached presents distinct issues, the Court addresses each separately.

### 1. The PSOR Agreement

Bowman maintains that he was entitled to PSOR payments (provided, of course, that he met the relevant requirements) for jobs conducted between approximately August of 2015 and November of 2016.[53]  In response, Defendant submits a declaration from Megan Piechowski, its Chief Administrative Office and General Counsel, in which she declares that "Bowman . . . was paid all overrides for which he was eligible under his PSOR program."[54]  Bowman contests this and asserts

---

[49] *Shargian v. Shargian*, 2022 U.S. Dist. LEXIS 48630, *14 (E.D. La. March 18, 2022) (quoting *Favrot v. Favrot*, 68 So. 3d 1099, 1108–09 (La. App. 4 Cir. 2011)).

[50] *Ashy v. Trotter*, 888 So.2d 344 (La. App. 3 Cir. 11/10/04).

[51] La. C.C. Art. 1846.

[52] *Diversified Marine Servs., Inc. v. Jewel Marine, Inc.*, 2016-0617 (La. App. 1 Cir. 6/2/17), 222 So. 3d 1008, 1014.

[53] R. Doc. 122-7 at p. 5.

[54] R. Doc. 122-4 at p. 2.  Bowman contests the validity of this declaration as Piechowski started working for Defendant in December of 2020, well after the timeframe in which Bowman was receiving PSOR payments.  R. Doc. 129 at p. 11 n.4.  The Court declines to strike Piechowski's declaration as to this

that, in violation of the PSOR policy, Defendant reduced what he was owed "based on expenses it incurred with the job."[55]   Bowman identifies specific jobs in which these violations occurred in a declaration of his own.   Defendant retorts that those specific examples are of jobs where Bowman did not meet the prerequisites for PSOR payments.   For some of them, Defendant submits that Bowman "did not timely code them in accordance with the PSOR policy."[56]   As the Court concurs with Defendant, there is no genuine dispute of material fact as to those jobs.

However, Defendant also states that the other specifically identified shortfalls should not be held to be a genuine issue of dispute as those jobs involved so-called "swing consultants."[57]   According to Defendant's Director of Finance for Accounts Payable, "[d]uring busy periods at YA a 'swing consultant' could be assigned to a job. This was a consultant in one region, temporarily assigned to work in another region. . . . If a 'swing consultant' was used on a Southeast Region job, only 50 percent of the hours would have been eligible for profit override sharing."[58]   In the jobs specifically identified by Plaintiffs, a swing consultant was assigned, thereby, Defendant asserts, cutting what he was owed in half.   Defendant also attaches emails in which Bowman references swing consultants by which they purport to show his knowledge of the practice.[59] However, while Defendant has shown that Bowman was aware of the concept of swing consultants, they have not shown that Bowman knew or agreed that

---

fact, however, as Piechowski is the custodian of the Defendant's business records which detail the override payments to Bowman.
[55] R. Doc. 129 at p. 11.
[56] R. Doc. 143 at p. 6.
[57] *Id.*
[58] R. Doc. 143-1 at pp. 1–2.
[59] *Id.* at pp. 5–13.

this would impact his profit share for those jobs.  The PSOR policy itself makes no reference to swing consultants and does not contain language suggesting in any way that the $10-per-hour is modifiable for such reasons.  In fact, it states instead that "[t]he code above [Bowman's PSOR code] is locked to the rate above"—that is, "$10.00 per supervised consulting hour."[60]  At best, what Defendant seeks to demonstrate is an oral modification to the PSOR policy, and it provides no corroborating evidence to demonstrate this change.  The closest evidence Defendant puts forth in support is Bowman's admission that "Bushman discussed with Bowman the possibility that some projects might only warrant an OR of $5 per supervised consulting hour."[61] Again, however, the code that Bowman had and used for these jobs was, by the terms of the agreement, locked to $10-an-hour.  Bowman has presented evidence sufficient to demonstrate a genuine issue of material fact as to whether Defendant breached this agreement.

### 2. The Revenue Share Program

The second payment plan about which there is dispute is what Defendant calls the "Bushman Revenue Share."[62]  Bushman's recollection is that he "informed Luke that I was going to share some of my money with Luke," but that Bushman "never made a promise" as to any amount of funds he would share.[63]  However, it is undisputed that this "discretionary" share program replaced the PSOR program.[64]

---

[60] R. Doc. 129-4 at p. 12.
[61] R. Doc. 129-5 at p. 3.
[62] R. Doc. 122-2 at p. 14.
[63] R. Doc. 122-6 at p. 10.
[64] *Id.*; R. Doc. 122-7 at p. 9 (Bowman testifying: "it was a break of the old agreement, and . . . a whole new agreement was presented.").

Defendant contends that this was not a contract at all, and certainly not one for which Plaintiffs can demonstrate a meeting of the minds as to a particular, enforceable set of terms.    In Defendant's approximation, this is analogous to the situation in *Ashker v. Horizon Offshore Contrs., Inc.*, which involved an alleged oral promise to pay the plaintiff some part of "10% of the company's gross revenues" as a special bonus.[65]  The plaintiff in *Ashker* testified that the promisor "was to have complete discretion regarding whether Plaintiff was to receive any or all of the bonus pool."[66] The *Ashker* court dismissed the contract claim for two reasons: first, that "the alleged terms of the promise are too indefinite."[67]  As the amount "was left completely up to . . . discretion," and as "Plaintiff was unable to say with any certainty which individuals would be eligible for the bonus," "a factfinder would be left to speculation and guessing to quantify what if anything was owed to Plaintiff."[68]  Second, the court held that the alleged promise "was not a bargained for exchange," and was thus best construed as "a unilateral statement gratuitously made and expressing a hope of what might possibly occur in the future."[69]

Here, says Defendant, Bushman made a gratuitous promise of future funds and Bowman cannot demonstrate that he was owed "a specific profit-sharing percentage."[70]  At most, Bowman has claimed that he was owed "more" money than he had been making under the PSOR, and he was indeed given more.[71]  Thus,

---

[65] 2000 U.S. Dist. LEXIS 5752, at *9 (E.D. La. April 27, 2000).
[66] *Id.* at *10–11.
[67] *Id.* at *11.
[68] *Id.* at *11–12.
[69] *Id.* at *13.
[70] R. Doc. 122-2 at p. 18.
[71] *Id.*

Defendant concludes, there was neither a contract to breach nor a breach of a contract.

Unlike the promise in *Ashker*, there is a genuine dispute as to whether or not Bushman's revenue share was discretionary.  While Bowman has not shown a specific percentage, he has alleged that Defendant agreed to calculate a percentage by which he would be compensated.[72]  As Plaintiffs put it, the "dispute is whether Bushman represented that Bowman would receive the same percentage of net profits he already was entitled to receive pursuant to the individual override agreement," or, as Defendant contends, Bushman "told Bowman the amount paid would be discretionary and was not guaranteed."[73]  Additionally, there was at least some exchange of value between the parties—Bowman consented to end his participation in the PSOR agreement in exchange for what he believed to have been a promise of a percentage share of the region's profits.

Moreover, there is a genuine dispute as to the existence of an oral contract here.  In a purportedly non-exhaustive list of corroborating circumstances, Bowman suggests that the following facts support his position: (1) "Bushman's admission that he 'offered' Bowman an individual regional override and did so to 'incentivize' Bowman;" (2) the suggestion that Bushman made this offer because he was "concerned" that Bowman was going to be poached by a competitor; (3) an admission

---

[72] *See* R. Doc. 122-7 at p. 10 (Bowman testifying that he was promised that "would make a percentage equivalent to the $10-an-hour deal" he had been receiving under the terms of the PSOR).  As Plaintiffs point out in their Opposition, even if a plaintiff is unable to demonstrate a specific percentage owed to plaintiff under a contract, a plaintiff may still be able to recover a reasonable amount, despite the lack of certain agreed upon terms.  *See Allain v. Tripple B Holding, LLC*, 2013-673 (La. App. 3 Cir. 12/11/13); 128 So. 3d 1278, 1283.

[73] *See* R. Doc. 129 at p. 15.

by Young that Defendant often "cuts deals" with its consultants that are not documented; (4) Defendant's subsequent implementation of a percentage payment program for all consultants; (5) Defendant's payments to Bowman of "a fixed percent of profit for the Southeast Region," that is, the seven percent that Bushman says he paid Bowman;[74] and (6) an admission in response to an interrogatory that it had agreed to pay Bowman a percentage "from the revenue share that would otherwise be distributed to Wade Bushman and Ray Young."[75]

Conversely, Defendant argues that Plaintiffs have not "come forward with competent corroborating [sic] demonstrating a meeting of the minds on a specific profit-sharing percentage . . . ."[76]  In their Reply to the Motion, Defendant cites and discusses several Louisiana state court cases concerning the standards required to prove sufficient corroborating evidence of an oral agreement.[77]  Notably, not a single one of the cases cited by Defendant concerns the standards relevant to summary judgment.[78]  At this stage, the Court must determine whether there exists a genuine dispute of material fact for the trier of fact to resolve, not whether Plaintiffs have sufficiently proved their case by a preponderance of the evidence.  "[A]t the summary

---

[74] R. Doc. 129-2 at p. 35.
[75] R. Doc. 129 at pp. 13–14.  Defendant points out that the interrogatory response was later amended to remove the reference to Ray Young.  R. Doc. 143 at p. 3.
[76] R. Doc. 122-2 at p. 18.
[77] R. Doc. 143 at pp. 2–4.
[78] The Court also notes that each case cited by Defendant is highly fact-specific, as the inquiry into sufficient corroborating circumstances necessarily is, and that the mere fact that the facts in this case do not directly mirror the facts of other cases does not in itself suggest that Plaintiffs have failed to demonstrate corroborating evidence.  Moreover, at the procedural stage relevant *to this case*, the Court's only concern is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.  That Plaintiffs *might* not have a sufficient case is not proper grounds for dismissal at summary judgment.

judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."[79]

Here, Plaintiffs have "set forth specific facts showing that there is a genuine issue for trial."[80]   Plaintiffs have alleged a number of facts that they contend corroborates the agreement between Defendant and Bowman.   Again, under Louisiana law, corroborating evidence "may be general and need not prove every detail of the plaintiff's case."[81]   Defendant, in turn, disputes the probative weight of that evidence and the credibility of Plaintiffs.[82]   But, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ."[83]   Drawing all inferences in favor of the non-moving party, as this Court must,[84] the Court finds there to be a genuine dispute as to whether the alleged promises were made.

Therefore, the Court will not grant summary judgment as to this element of the breach of contract claim.

### 3.  The Leadership Pool

Defendant likewise contends that Bowman's breach of contract claim with regard to payouts from the Leadership Pool fails for the same lack of corroborating

---

[79] *Id.* at 249.
[80] *Id.* at 248 (quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288 (1968)).
[81] *Diversified Marine Servs., Inc.*, 222 So. 3d at 1014.
[82] R. Doc. 122-2 at p. 18 ("There exists no credible evidence in the record upon which a reasonable jury could determine a valid oral agreement for a specific amount of revenues existed . . . .").
[83] *Anderson*, 477 U.S. at 255.
[84] *Id.*

evidence.  Bowman agrees: that he entered the Leadership Pool willingly;[85] that, by entering, he was agreeing to a new system of compensation which superseded the Bushman revenue share;[86] that there was no document outlining the terms of the Leadership Pool;[87] and that he was never told what percentage of the net profit to Defendant from the region went into the pool.[88]  Nonetheless, he contends, the dispute regarding the leadership pool "is whether Bushman represented that Bowman would receive the same percentage of net profits he already was entitled to receive pursuant to the individual override agreement or told Bowman the amount paid would be discretionary and was not guaranteed."[89]  Bowman asserts that Bushman told him that his percentage share from the Leadership Pool "would be equivalent to the individual override that I had already been receiving."[90]  However, the corroborating evidence is insufficient to demonstrate the existence of a contract which was breached.  The nearest Bowman presents to corroborating evidence for his claim is testimony from another member of the leadership pool that Bushman indicated to that member that his compensation would increase by his entry into the leadership pool: "[Bushman] made the comment that . . . I should be covered for what I was getting and hopefully a little more."[91]  That member, however, had been on a set $6,000-per-month compensation, not at all akin to the profit share Bowman was

---

[85] R. Doc. 122-7 at p. 17.
[86] *Id.*
[87] *Id.* at p. 18.
[88] *Id.* at p. 17.
[89] R. Doc. 129 at p. 15.
[90] R. Doc. 122-7 at p. 16.
[91] R. Doc. 129-11 at p. 10.

receiving.[92]   And even that member's statement is insufficient to corroborate Bowman's assertion that Bushman contracted with Bowman to ensure Bowman would receive a greater sum via the Leadership Pool.  As Plaintiff has failed to demonstrate that a genuine dispute exists regarding the corroborating evidence sufficient to demonstrate a contract here, the Court will grant summary judgment as to this claim.

### B. Louisiana Wage Payment Act (LWPA) Claim

The LWPA provides in relevant part that, "[u]pon the resignation of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment."[93]   Defendant contends that this statute does not apply to independent contractors and thus this claim ought to be dismissed.  There is no dispute that Bowman was an independent contractor for Defendant.[94]  As this Court has elsewhere recognized, "the LWPA does not cover independent contractors."[95] While Bowman makes a compelling argument in which he construes the linguistics of the statute so as to include independent contractors, Louisiana courts have rejected this very construction.[96]  Therefore, because Bowman cannot advance an LWPA claim as a matter of law, summary judgment is appropriate as to this claim.

---

[92] *Id.*
[93] La. R.S. 23:631.
[94] *See* R. Doc. 122-2 at p. 26.
[95] *Badon v. Berry's Reliable Res., LLC*, 2021 U.S. Dist. LEXIS 126056, at *11 (E.D. La. July 7, 2021) (citing *Knapp v. Management Co.*, 476 So. 2d 567, 568 (La. App. 3 Cir. 1985)).
[96] *See Knapp*, 476 So. 2d at 569 (rejecting the argument that "if [plaintiff] is not an employee, he is within the class of persons covered by the statute which are called 'any laborer or other employee of any kind whatever.'").

### C. Louisiana Unfair Trade Practices Act (LUTPA) Claim

The Louisiana Unfair Trade Practices Act ("LUTPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."[97]  "The span of prohibited practices under LUTPA is extremely narrow."[98]  As the Fifth Circuit has recognized, "LUTPA does not prohibit sound business practices, the exercise of permissible business judgment, or appropriate free enterprise transactions."[99]  Instead, the "actions must have been taken with the specific purpose of harming the competition."[100]  "There is a great deal of daylight between a breach of contract claim and the egregious behavior the statute proscribes;" however, LUTPA cases "often involve breaches of ethical standards arising from the employer-employee relationship."[101]  In fact, "[a]lthough LUTPA does not provide an alternative remedy for simple breaches of contract . . . Louisiana courts permit LUTPA claims based on breaches of ethical standards even if there are 'parallel remedies for similar conduct.'"[102]  Here, Defendant claims that as the LUTPA claim is "a complete recitation of [Bowman's] breach of contract claim," it ought to be granted summary judgment as to the LUTPA claim.[103]

---

[97] La. R.S. 51:1405(A).

[98] *Walker v. Hixson Autoplex of Monroe, L.L.C.*, 51,758 (La. App. 2 Cir. 11/29/17); 245 So. 3d 1088, 1095 (citations omitted).

[99] *Omnitech Int'l, Inc. v. Clorox Co.*, 11 F.3d 1316, 1332 (5th Cir. 1994) (citation omitted).

[100] *Monroe v. McDaniel*, 207 So. 3d 1172, 1180 (La. App. 5 Cir. 2016).

[101] *Turner v. Purina Mills, Inc.*, 989 F.2d 1419, 1422 (5th Cir. 1993) (citation omitted).

[102] *IberiaBank v. Broussard*, 907 F.3d 826, 840 (5th Cir. 2018) (quoting *Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 405 (5th Cir. 2000)).

[103] R. Doc. 122-2 at p. 27.

In this case, Bowman's complaint indicated that the "unfair" conduct in question was "[Defendant]'s misrepresentations."[104]  In his opposition to this Motion, Bowman elaborates that his LUTPA claim is "based on his contention that [Defendant] made fraudulent and dishonest representations to him so it could retain and exploit him."[105]  This is not identical to his breach of contract claim; in the absence of an oral contract of any kind Defendant may still have made fraudulent representations to Bowman that could provide the basis for a LUTPA claim.  Bowman claims that Defendant, "concerned" that Bowman would be enticed to join a competing firm, "promised Bowman a share of the profits for all projects throughout the entire Southeast Region,"[106] and that Bushman "promised Bowman he would receive the same percentage of net profits he was receiving under his individual deal if he entered the Leadership Pool."[107]  As such, there is a genuine dispute of material fact as to whether Defendant's conduct violates LUTPA regardless of whether or not these alleged promises are found to have been contracts.  Contract or no contract, Bowman has alleged "some element of fraud, misrepresentation, deception, or other unethical conduct" on Defendant's behalf with these allegedly fraudulent misrepresentations.[108]  This claim survives summary judgment.

---

[104] R. Doc. 1-2 at p. 17.

[105] R. Doc. 129 at p. 18.

[106] *Id.* at p. 4.

[107] *Id.* at p. 8.

[108] *Dufau v. Creole Engineering, Inc.*, 465 So. 2d 752, 758 (La. 1985).

### D. Fraud, Fraudulent Inducement, and Negligent Misrepresentation

To maintain a fraud claim, a plaintiff must show: "1) a misstatement or omission; 2) of material fact; 3) made with the intent to defraud; 4) on which the plaintiff relied; and 5) which proximately caused the plaintiff's injury."[109]   The elements of fraudulent inducement are essentially identical.[110]   Meanwhile, a claim for negligent misrepresentation requires demonstration of three elements: "(1) there must be a legal duty on the part of the defendant to supply correct information; (2) there must be a breach of that duty; and (3) the breach must have caused damages to the plaintiff."[111]   Defendant groups these claims because of what it says is a common element for all three which is not present in this case: "a material misrepresentation by [Defendant] for which Bowman relied on and was damaged."[112]   Defendant argues that it made no misrepresentations, fraudulent or otherwise, and claims that Bowman has presented no evidence of fraudulent intent.

"Fraud cannot be predicated on statements that are promissory in nature or relating to future events. . . . However, fraud may be based on promises made when there was no intention to perform as promised."[113]   In this case, Defendant contends, at most Bowman has argued that "[Defendant] did not make good on its promises to

---

[109] *Williams v. WMX Techs.*, 112 F.3d 175, 177 (5th Cir. 1997) (citing *Cyrak v. Lemon*, 919 F.2d 320 (5th Cir. 1990)).

[110] *See Henry v. Cisco Sys.*, 106 Fed. Appx. 235, 239 (5th Cir. 2004) (per curiam) (citations omitted) ("Thus, the general elements of a fraudulent inducement claim are: '(1) a misrepresentation of a material fact, (2) made with an intent to deceive, and (3) causing justifiable reliance with resulting injury.'").

[111] *Cypress Oilfield Contractors, Inc. v. McGoldrick Oil Co.*, 525 So. 2d 1157, 1162 (La. App. 3 Cir. 1988).

[112] R. Doc. 122-2 at p. 30.

[113] *Taylor v. Dowling Gosslee & Assocs.*, 44,654 (La. App. 2 Cir. 10/07/09); 22 So. 3d 246, 255.

pay him more money in the future if he continued working with [Defendant] as an independent contractor."[114]   Defendant suggests that this case is analogous to *America's Favorite Chicken Co. v. Cajun Enters.*, in which the Fifth Circuit found that the representations in question there were "nothing more than projections of future events and, as such, are not actionable as fraud under Louisiana law."[115]   Defendant submits that, here, Bushman at most indicated to Bowman that his earnings might increase in the future if Bowman agreed to shift from (1) the PSOR agreement to the Bushman revenue share and (2) from the Bushman revenue share to the Leadership Pool.

The Court disagrees.   Bowman alleges that Bushman informed him that in moving to the revenue share program he would be receiving "a specific percentage of profits for the entire Southeast Region" but that he never intended to calculate or share that percentage, and that in moving from the revenue share program to the leadership pool Bowman would be receiving "the same percentage of net profits he was receiving under his individual deal."[116]   Bowman's contention is that he would be paid a determinable amount under each agreement, namely, "an equivalent of the $10-an-hour deal translated into a percentage."[117]   Unlike in the breach of contract claim, Bowman need not provide corroborating evidence in order to defeat summary judgment as to this issue; this is a simple question of witness credibility between Bushman, who claims his sharing was entirely discretionary, and Bowman, who

---

[114] R. Doc. 122-2 at p. 31.
[115] 130 F.3d 180, 186 (5th Cir. 1997).
[116] R. Doc. 129 at p. 8.
[117] R. Doc. 122-7 at p. 10.

claims there was a determinable amount he was promised.  If Bushman made such a promise intending never to fulfill it, that may well be fraud.  At the least, there is sufficient dispute to survive summary judgment on this issue.

Additionally, Defendant suggests that the continual increases in Bowman's pay throughout his time at YA proves that the company had no intent to deceive Bowman.[118]  This is irrelevant.  At issue is not whether Bowman earned more money each year at YA, but whether he was paid what he was owed.  The question of Defendant's intent remains an open one.  Summary judgment is not appropriate for these claims.

### E. Detrimental Reliance

"A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying."[119]  "It is difficult to recover under the theory of detrimental reliance, because such a claim is not favored in Louisiana."[120]  "To establish detrimental reliance, a party must prove three elements by a preponderance of the evidence: (1) a representation by conduct or word; (2) justifiable reliance; and (3) a change in position to one's detriment because of the reliance."[121]  Notably, "Louisiana law does not require proof of a formal, valid, and enforceable contract" to prove a detrimental reliance claim.[122]

---

[118] R. Doc. 122-2 at p. 32.
[119] La. C.C. Art. 1846.
[120] *In re Ark-La-Tex Timber Co., Inc.*, 482 F.3d 319, 334 (5th Cir. 2007).
[121] *Suire v. Lafayette City-Parish Consol. Gov't*, 907 So. 2d 37, 59 (La. 2005).
[122] *Id.*

Defendant claims that Bowman cannot demonstrate either the first or the third elements of this test. First, they state that "it is undisputed that [Defendant] did not make a specific representation regarding a specific percentage of profits for which Bowman would be entitled," and, as such, "Bowman cannot contend he 'relied' on something he admits he had no knowledge of."[123] Alternatively, Defendant submits, "there is no evidence that Bowman changed his position because of any of the alleged misrepresentations."[124] Bowman responds that, while he did not have knowledge of a specific percentage to which he was entitled under what he believed to be an agreement, he did believe that he "would make a percentage equivalent to the $10-an-hour deal" he had been receiving under the terms of the PSOR.[125] Moreover, Bowman contends that, when he agreed to transition to the leadership pool system from the percentage agreement he believed he had with Bushman, he relied to his detriment on Bushman's representation that Bowman would be receiving from the leadership pool an amount "equivalent to the individual override that [he] had already been receiving."[126] As the transition to the leadership pool arguably diminished his earning ability, Bowman's claim for detrimental reliance survives summary judgment.[127]

---

[123] R. Doc. 122-2 at p. 33.

[124] *Id.*

[125] *Id.* at p. 10.

[126] R. Doc. 129-13 at p. 41.

[127] Defendant states in its reply that, as "Bowman made significantly more money every year in the Leadership Pool . . . it cannot possibly be claimed that his 'reliance' caused him detriment." R. Doc. 143 at p. 10. This is a specious argument. Again, the question is not how much Bowman earned but how much he was owed. Throughout its motion and reply, Defendant attempts to cast aspersions on Bowman for seeking more when he was given much. It is neither the Court's concern nor the Court's place to determine whether Bowman is greedy or ungrateful; nor is it of import whether Defendant made more or less in profit due to its association with Bowman. The question is merely what Bowman

## IV. Conclusion

Accordingly, **IT IS ORDERED** that the Motion for Partial Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.  The Motion is **GRANTED** as to the breach of contract claims regarding the third purported agreement and the LWPA claim.  The Motion is **DENIED** with regard to the remaining claims: namely, the breach of contract claim as to the PSOR agreement and the Revenue Share Program, the LUTPA claim, and the claims for fraud, fraudulent inducement, negligent misrepresentation, and detrimental reliance.

New Orleans, Louisiana, September 1, 2022.

_____

**WENDY B. VITTER**
**UNITED STATES DISTRICT JUDGE**

---

was owed according to his agreements with Defendant and according to any promises he was given.
To suggest that Bowman seeks more money because, for example, what he received "just wasn't good
enough" is at best ignorant to the questions at hand.  R. Doc. 122-2 at p. 2.